**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky (ID 012431974)
New Jersey Resident Partner
Lauren E. O'Donnell (ID 13292009)
300 Carnegie Center, Suite 220
Princeton, NJ  08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Stephen.Orlofsky@BlankRome.com
Lauren.ODonnell@BlankRome.com         *Attorneys for Plaintiff, Indigitech, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDIGITECH, INC.,<br>3375 S. Rainbow Boulevard, #81710<br>Las Vegas, NV 89146<br>　　　　　　　　　　　　Plaintiff,<br>　v.<br>FIRST DATA MERCHANT SERVICES, LLC,<br>2900 Westside Parkway<br>Alpharetta, GA 30004;<br>TELECHECK SERVICES, LLC,<br>1600 Terrell Mill Road<br>Marietta, GA 30067;<br>and<br>MONEY NETWORK FINANCIAL, LLC,<br>2900 Westside Parkway<br>Alpharetta, GA 30004,<br>　　　　　　　　　　　　Defendants. | Docket No.:<br>Civil Action<br><br><br><br>**COMPLAINT** |

Plaintiff Indigitech, Inc. ("Indigitech"), by its undersigned counsel, files this

Complaint against Defendants First Data Merchant Services LLC ("FDMS"),

134337548

Telecheck Services, LLC ("Telecheck") and Money Network Financial, LLC ("Money Network") (collectively, "Defendants"), and avers as follows:

## PRELIMINARY STATEMENT

1. Payment processing is a billion-dollar industry. There are billions of credit card transactions per year across the globe. In fact, consumers in North America spend over $3 trillion per year using credit cards, and payment processing fees total approximately $85 billion per year.

2. Payment processing companies contract with merchants to provide services that enable consumers to make purchases using credit cards, debit cards, gift cards, or checks.

3. Payment processing companies' revenue increases when the volume and value of the merchants' transitions increases. Thus, in order to earn more profit, payment processing companies must establish relationships with merchants who handle a high volume of customer transactions.

4. This action arises because Defendants—prominent payment processing companies—agreed to pay Plaintiff a portion of the revenue that they earned from any merchant who Plaintiff referred to Defendants for the provision of payment processing services.

5. Plaintiff performed its obligations under the agreement, referring lucrative merchants to Defendants, but Defendants have substantially

undercompensated Plaintiff and failed to properly report how they have calculated the referral payments.

6.  Defendants' actions breached their agreement with Plaintiff in multiple ways and unjustly enriched Defendants.

7.  As detailed below, Plaintiff seeks relief from this Court due to Defendants' conduct, including all compensatory damages arising from Defendants' breaches of contract and unjust enrichment.

## **THE PARTIES**

8.  Plaintiff Indigitech, Inc. is a Nevada corporation with its principal place of business in Nevada.

9.  Defendant FDMS is a Florida limited liability company with its principal place of business in Georgia. FDMS is an indirect wholly-owned subsidiary of Fiserv, Inc., ("Fiserv") a Wisconsin company with its principal place of business in Wisconsin. The sole member of FDMS is First Data Corporation ("First Data"), a Delaware corporation with its principal place of business in Georgia, which is also a wholly-owned subsidiary of Fiserv.

10. Defendant Telecheck is a Delaware limited liability company with its principal place of business in Georgia.

11. Plaintiff is informed and believes and based thereon alleges that Telecheck is also an indirect wholly-owned subsidiary of Fiserv, and that the sole member of Telecheck is First Data.

12. Defendant Money Network is a Delaware limited liability company with its principal place in Georgia.

13. Plaintiff is informed and believes and based thereon alleges that Money Network is also an indirect wholly-owned subsidiary of Fiserv, and that the members of Money Network are FDMS, and Fiserv Transaction Services, LLC, a Colorado limited liability company with its principal place of business in Wisconsin.

14. The sole member of Fiserv Transaction Services, LLC is Fiserv

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is diversity of citizenship among the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest, cost, and attorney's fees.

16. This Court has personal jurisdiction over Defendants because Plaintiffs referred Defendants to customers located in New Jersey, Defendants provided payment processing services to those New Jersey customers, and this action is a result of Defendants' failure to sufficiently compensate Plaintiff in connection with the revenue that they earned from those New Jersey services, as well as others.

17. Venue is proper pursuant to 28 U.S. Code § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the District of New Jersey. The Hard Rock Hotel & Casino ("Hard Rock AC"), a property of Hard Rock International ("Hard Rock"), one of the key accounts at issue

4

134337548

in this case, is located in New Jersey. Defendants have been substantially underpaying Plaintiff in connection with the Hard Rock AC.

## BACKGROUND

### A.   THE PAYMENT PROCESSING BUSINESS.

18. FDMS is a payment processor that provides merchants with the ability to accept credit cards, debit cards, and gift cards as payment for the goods and services that merchants offer for sale ("Payment Card Services").

19. Telecheck offers check authorization services to merchants ("Telecheck Services").

20. Money Network provides merchants with a payroll program for its employees ("Money Network Services").

21. The Payment Card Services, the Telecheck Services, and the Money Network Services, as well as various backend financial services related to and/or supporting payment processing, are collectively referred to as "Payment Processing Services."

22. Defendants profit from the Payment Processing Services that they provide to merchants. Defendants' profits are based upon the volume and value of the transactions that the merchants process.

23. Beginning in 2005, Rocco Gardner has developed professional and personal relationships with large merchants that process transactions totaling millions of dollars monthly (the "Customers"). Many of these Customers include

casinos and hotels owned and operated by various Native American tribes. Mr. Gardner eventually formed Escape Productions LLC ("Escape"), in part, to support those Customers.

24. Access to these Customers would benefit payment processing companies given the large volume and value of payment transactions that the Customers process per month.

### B. THE PARTIES' REFERRAL AGREEMENT.

25. Accordingly, on July 21, 2015, Escape, FDMS, and Telecheck entered into a Referral Agreement. A true and correct copy of the Referral Agreement is attached hereto as Exhibit "A."

26. Pursuant to the Referral Agreement, Escape "will actively promote and recommend [Defendants'] Payment Processing Services to its Customers" "in contemplation of such Customers entering into written agreements with [Defendants] for the provision of [Payment Processing Services] ('Service Agreements')." *See* Ex. A at § 2.1 and Recital B.

27. The Referral Agreement was amended on March 8, 2017 to add Money Network as a Payment Processor. A true and correct copy of the March 8, 2017 Amendment is attached hereto as Exhibit "B."

28. Per the amended Referral Agreement, Defendants are required to pay Escape 15% of the "Net Recurring Revenue collected during a calendar month from each referred Customer that has entered into a Service Agreement with FDMS,

TeleCheck or Money Network and that is actively using the Payment Processing Services (sometimes referred to in the Agreement and this Amendment as 'Residual Fees' or 'Fees')." *See* Ex. B at § 5.1.

29. "Net Recurring Revenue" means "(a) with respect to Payment Card Services and Money Network Services, the total Customer paid fees and discounts under a Service Agreement (including gift card fees), minus upfront application fees, equipment fees, and card association interchange fees, card association assessments, and other applicable card association fees; (b) with respect to TeleCheck Services, the total Customer paid fees for inquiry charges, transaction fees and monthly minimums minus TeleCheck's standard wholesale rates for such fees with respect to the merchant's standard industrial classification for its channel sales." *See id.*

30. The Referral Agreement was again amended on October 4, 2017. A true and correct copy of the October 4, 2017 Amendment is attached hereto as Exhibit "C."

31. The October 4, 2017 Amendment requires Defendants to pay Escape "a one-time payment of one hundred dollars ($100.00) for each Clover device (other than Clover Go readers) that a referred Customer purchases under its Service Agreement ('Clover Equipment Fee')." *See* Ex. C at § 5.1.1.

32. The Payment Providers are required to "calculate and pay the Clover Equipment Fee and Residual Fees (collectively, 'Customer Fees') to [Escape] on a

7

monthly basis, within thirty (30) days from the end of the applicable calendar month." *See* Ex. C at § 5.2.

33. The Payment Providers are also required to "provide [Escape] with a detailed report showing the calculation of Customer Fees to correspond with each monthly payment." *Id.*

34. On June 27, 2023, Escape and Plaintiff entered into an Assignment and Assumption Agreement in which Escape assigned all rights and duties under the Referral Agreement to Plaintiff, and Plaintiff assumed all rights, obligations and claims related thereto. A true and correct copy of the Assignment is attached hereto as Exhibit "D."

    **C.**    **DEFENDANTS BREACHED THE REFERRAL AGREEMENT IN MULTIPLE WAYS.**

35. Per the terms of the Referral Agreement, Plaintiff referred Customers to Defendants which resulted in a number of signed Service Agreements between Customers and Defendants, including significantly the Seminole Tribe of Florida, Inc. which was key also to Hard Rock International Incorporated because the Seminole Tribe ultimately acquired and now controls Hard Rock.

36. By way of example only, Defendants signed Service Agreements with the following Customers as a direct result of Plaintiff's referrals: Seminole Tribe of Florida Inc. and all affiliates, which include many casinos as well as the restaurants and shops in those casinos; Hard Rock International Incorporated and all affiliates,

which includes many hotels, casinos, shops and restaurants; Soho House; and Air Havana.

37.     The business relationships between Defendants and these Customers would not exist but for Plaintiff's referral of Customers to Defendants.

38.     Since the inception of the Referral Agreement, Defendants have substantially underpaid the amount of Customer Fees that they owe to Plaintiff.

***Under-reported Revenue***

   A.     Inaccurate Reporting of Revenue from MIDs

39.     For example, Defendants monthly reports to Plaintiff routinely show hundreds of Customer Merchant Identification numbers ("MIDs")—which are unique numbers that credit card companies assign to merchants (including, for example, restaurants within a casino hotel, the reservation system, the casino floor, and various shops in the hotel) —as having a zero ($0.00) balance (meaning no transaction processing activities for that MID).  Because the Customers are using Defendants' services, there should be a positive balance, not a zero balance, for all or nearly all MIDs.  Plaintiff receives no revenue from MIDs with a zero balance.

40.     As a result of Plaintiff's relationships with the Customers, Plaintiff has reason to believe that the Net Recurring Revenue received from the Customers' payment processing operations was substantially higher than what was reported to Plaintiff by Defendants.

41. For example, Plaintiff has access to four randomly-selected monthly statements that Defendants sent to Hard Rock for transactions completed in September 2020 at Hard Rock AC and three other Seminole Tribe and Hard Rock properties. Each of the four statements shows that Defendants are underpaying Plaintiff.

42. Specifically, three of the four statements reflect that the amount of fees that Defendants charged to Seminal Tribe and Hard Rock (net of interchange fees) were 70-100% *higher* than what Defendants reported to Plaintiff. The fourth statement is related to a MID that Defendants reported to Plaintiff as having zero revenue in September 2020; but the statement reflects that Defendants actually processed $5.5 million in card transactions and generated over $4,000 in fees (net of interchange fees) for that MID.

43. These sample statements were for just four MIDs for one customer for one month. There are hundreds of MIDs associated with customers referred to Defendants by Plaintiff, and monthly statements are generated for each MID for each customer for each month.

44. Further, the monthly statements to Plaintiff have reported very few of the Clover Equipment Fees that are required by the October 4, 2017 Amendment.

45. As a result of under-reporting of the Net Recurring Revenue and the Clover Equipment Fees from the Customers referred by Plaintiff, Defendants have

not properly compensated Plaintiff for the actual volume and value of the Customers' payment processing operations.

### B. MIDs and Transaction Types Not Properly Credited to Plaintiff

46. In addition to the failure to accurately report revenue associated with MIDs assigned to Customers referred by Plaintiff, Defendants have failed to accurately associate all MIDs for such Customers with Plaintiff's accounts. For example, Plaintiff has been informed by persons formerly associated with Defendants that the Defendants have repeatedly failed to associate with Plaintiff several MIDs associated with card processing transactions for Customers referred by Plaintiff, meaning that any revenues and fees generated through those MIDs was never counted toward the amounts to be shared with Plaintiff under the Referral Agreement.

47. Further, since establishing accounts with Defendants pursuant to Plaintiff's referrals, Hard Rock properties started processing Credit Card Cash Advance ("CCCA") transactions with Defendants. Plaintiff is informed and believes and based thereon alleges that Defendants have never properly shared with Plaintiff the revenue associated with CCCA transactions through Hard Rock properties. Likewise, Plaintiff is informed and believes and based thereon alleges that Hard Rock has begun using other payment mechanisms from Defendants since Plaintiff's introduction (including Hard Rock's mobile wallet for online customers, online payments for goods and services purchased from Hard Rock, payroll cards, tribal

cards, and gift cards); but none of the revenue generated by Defendants from any of these payment mechanisms has been properly shared with Plaintiff.

48. Plaintiff is informed and believes and based thereon alleges that, as to one payment mechanism utilized by Hard Rock – Telecheck Services – Defendants provide certain services to Seminole Tribe and/or Hard Rock through a third-party and, on that basis, asserts that no revenues from those Telecheck Services are required to be shared with Plaintiff.  Prior to executing the Referral Agreement, Defendants represented that they had no relationship with the Seminole Tribe and Hard Rock (which are specifically listed on Exhibit A to the March 8, 2017 amendment to the Referral Agreement) and needed Plaintiff's assistance to establish such relationships.  As specified in the March 8, 2017 amendment, it was agreed that Plaintiff would be entitled to Residual Fees for the Customers on such Exhibit A.  Moreover, Defendants' relationships with these Customers, including the Telecheck Services, have developed and expanded directly as a result of Plaintiff's efforts.  All revenues earned by Defendants from those relationships with Seminole Tribe and Hard Rock are subject to the revenue share obligations to Plaintiff.

*Insufficient Reporting to Plaintiff*

49. Implicit in the obligations of Defendants under Section 5.2 of the Amended Referral Agreement is the obligation to provide Plaintiff a detailed report establishing the Net Recurring Revenue generated by each Customer MID, including

all revenue collected by Defendants and any offsets to that revenue claimed by Defendants in calculating Net Recurring Revenue.

50. Since the inception of the Referral Agreement, Defendants' reporting to Plaintiff falls far short of the detail necessary for Plaintiff to verify it is being compensated properly. The monthly reports Defendants provide to Plaintiff include the numerous MIDs repeatedly showing $0.00 in revenue alleged above; they also provide at best scattershot data which is difficult if not impossible to correlate with the actual Net Recurring Revenue generated by each Customer. Plaintiff is informed and believes and based thereon alleges that the scattershot data provided in the reports is materially incomplete in not reflecting all of the "Customer-paid fees and discounts, ... [and] Customer-paid fees for inquiry charges, transaction fees and monthly minimums" collected from Customers. Despite Plaintiff's numerous requests for improved reporting, Defendants have failed to provide sufficiently complete and detailed reporting as required by, and in breach of, the Referral Agreement.

51. On at least one occasion when asked for complete, detailed reporting, Defendants advised Plaintiff to instead go and request from the Customers all of the statements Defendants had issued to them for every MID for every month. Similarly, when Plaintiff asked to see copies of Defendants' contacts with the Customers, Defendants advised that Plaintiff had to go ask the Customers for copies of those contracts.

52. The insufficient reporting and under-payment of Residuals due to underreporting of Net Recurring Revenue and Clover Equipment Fees are breaches of the express and implied obligations of Defendants under the Referral Agreement.

## COUNT I - BREACH OF CONTRACT
### (Against All Defendants)

53. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

54. Plaintiff and Defendants entered into a valid, binding, enforceable Referral Agreement.

55. Plaintiff performed pursuant to the Referral Agreement, referring merchants to Defendants that resulted in those merchants contracting with Defendants for Payment Processing Services.

56. As detailed above, Defendants have breached material provisions of the Referral Agreement by, among other things, failing to compensate Plaintiff as per the terms of the Section 5 of the amended Referral Agreement and amendments thereto; and failing to provide Plaintiff with the accurate, detailed and complete reporting required by Section 5.2 of the amended Referral Agreement.

57. As a direct and proximate result of these breaches, Plaintiff has suffered and will continue to suffer significant financial harm, in an amount to be calculated at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, and requests that this Court enter an Order for all damages as permitted by law, including but not limited to prejudgment and post judgment interest, and all such other relief as the Court may deem just and proper.

## COUNT II (IN THE ALTERNATIVE) – UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

58. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

59. Plaintiff has enriched Defendants by referring Payment Processing Services business to Defendants.

60. Defendants have accepted and retained these benefits, which permitted Defendants to earn revenue from the Payment Processing Services business that Plaintiff referred to them.

61. Plaintiff conferred these benefits on Defendants to Plaintiff's expense because it spent time and financial resources establishing its relationships with the merchants who it referred to Defendants, yet Defendants have not lived up to their payment obligations.

62. It is inequitable and against good conscience to allow Defendants to retain the revenue that resulted from Plaintiff's efforts.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants, and requests that this Court enter an Order for all damages as permitted

by law, including prejudgment and post judgment interest, and all such other relief as the Court may deem just and proper.

Dated: February 2, 2024

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Lauren E. O'Donnell*
Stephen M. Orlofsky (ID 012431974)
New Jersey Resident Partner
Lauren E. O'Donnell (ID 13292009)
300 Carnegie Center, Suite 220
Princeton, NJ  08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Stephen.Orlofsky@BlankRome.com
Lauren.ODonnell@BlankRome.com

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

Plaintiff knows of no other arbitration or lawsuit involving this matter, nor is any to Plaintiff's knowledge contemplated, and Plaintiff knows of no other person who should be joined at this time.

        BLANK ROME LLP

        */s/ Lauren E. O'Donnell*
        Stephen M. Orlofsky (ID 012431974)
        New Jersey Resident Partner
        Lauren E. O'Donnell (ID 13292009)
        300 Carnegie Center, Suite 220
        Princeton, NJ  08540
        Telephone: (609) 750-7700
        Facsimile: (609) 750-7701
        Stephen.Orlofsky@BlankRome.com
        Lauren.ODonnell@BlankRome.com
        *Attorneys for Plaintiff*

Dated:  February 2, 2024

## **LOCAL CIVIL RULE 201.1(D)(3) CERTIFICATION**

Plaintiff hereby certifies that the damages recoverable exceed the sum of $150,000 exclusive of interest and costs and any claim for punitive damages.

**BLANK ROME LLP**

*/s/ Lauren E. O'Donnell*
Stephen M. Orlofsky (ID 012431974)
New Jersey Resident Partner
Lauren E. O'Donnell (ID 13292009)
300 Carnegie Center, Suite 220
Princeton, NJ  08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Stephen.Orlofsky@BlankRome.com
Lauren.ODonnell@BlankRome.com
*Attorneys for Plaintiff*

Dated:  February 2, 2024

134337548